*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* A. J. ALMEAMAAR, Minor.

UNPUBLISHED
July 25, 2024

Nos. 368520; 368521
Wayne Circuit Court
Family Division
LC No. 22-002302-NA

Before: LETICA, P.J., and BOONSTRA and MARIANI, JJ.

PER CURIAM.

In these consolidated appeals,[1] respondent-mother and respondent-father appeal by right the trial court's order terminating their parental rights to their minor child, AJA, under MCL 712A.19b(3)(b)(*i*) (parent's act caused physical injury to child), (b)(*ii*) (failure to prevent physical injury to child), (g) (failure to provide proper care or custody), (j) (reasonable likelihood of harm if returned to parent), (k)(*iii*) (parent abused child and abuse included battering, torture, or other severe physical abuse), and (k)(*v*) (parent abused child and abuse included life-threatening injury). We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Petitioner, the Department of Health and Human Services (DHHS), became involved in this case in September 2022 after Children's Protective Services (CPS) received allegations of severe physical abuse of AJA when she was approximately six weeks old. During its investigation of the allegations, DHHS determined that respondent-mother brought AJA to a pediatrician due to bruising on her neck and bloodshot eyes, and respondent-mother reported that she believed that AJA's injuries had resulted from respondent-father swaddling her too tightly and being too "rough" with her. Respondent-mother was lethargic and exhibited slow, slurred speech during the appointment, and the pediatrician believed her to be under the influence of substances. AJA

---

[1] *In re A J Almeamaar Minor*, unpublished order of the Court of Appeals, entered November 15, 2023 (Docket Nos. 368520; 368521).

struggled to breathe during the examination, so the pediatrician immediately transferred AJA to a local children's hospital via ambulance. While there, respondent-mother exhibited the same lethargy and slurred speech as she had at the pediatrician's office; respondent-mother informed the medical staff that she had recently taken Xanax, Norco, and ibuprofen. AJA's medical examination revealed extensive bruising on her face, neck, left arm, and chest; severe hemorrhages in both eyes; bruising in both ears; and rib fractures in eight of her left ribs and two of her right ribs. Respondents were arrested and charged with first-degree child abuse shortly thereafter.

During the investigation, CPS investigators confirmed with physicians that AJA's injuries were the result of nonaccidental trauma. Although respondents initially reported to the attending physician that AJA's injuries may have resulted from swaddling her too tightly or burping her too aggressively, the attending physician reported that the injuries could not have occurred from such actions. The physician reported that AJA's injuries were result of "squeezing, strangulation, smothering and/or being hit with a hand or object," and given that the injuries reflected various stages of healing, they had occurred over a period of time. When asked to explain AJA's injuries, both respondents initially denied knowing the cause. Respondent-mother eventually admitted, however, that she had dropped AJA a week prior but that the majority of AJA's injuries were caused by respondent-father, noting that he had, on multiple occasions, jumped on the bed while AJA was laying on it "to shake her," "picked [AJA] up with one arm and raised her in the air by her neck," threw her in the air, swaddled her too tightly, and acted "too rough" with her. Respondent-father stated that respondent-mother "never took care of" AJA and jeopardized AJA's welfare because she was "always" under the influence of substances and had gotten into a car accident while AJA "was in the front seat of the car." Respondent-father admitted, however, that he had caused AJA's injuries. He admitted that he knew that he injured AJA's ribs because he had squeezed her very hard as he was "wrapping [her] tightly in a swaddle blanket," "heard a pop, then [AJA] turned red, and milk came out of her nose." He further admitted that he had repeatedly "smacked [AJA] across the face," kicked AJA's bassinet several times while AJA was in it, and "choked and bruised" AJA by "grabbing the swaddle fabric near her neck" and picking her up.

DHHS subsequently filed a petition in October 2022 requesting that the trial court remove AJA from respondents' care, take jurisdiction over AJA, and terminate respondents' parental rights at initial disposition. Following a preliminary hearing, the trial court authorized the petition, removed AJA from respondents' care, and placed AJA in a foster home.[2]

The trial court conducted a combined adjudication and initial dispositional hearing in May 2023. Both respondents entered a no-contest plea, based on potential civil and criminal liability arising from the allegations of physical abuse of AJA. As a factual basis for the plea, the trial court relied on the CPS Investigation Report detailing the alleged abuse committed by respondents and their subsequent admissions to police officers and CPS investigators. The trial court accepted respondents' pleas and entered an order exercising jurisdiction over AJA, finding that the factual basis for the pleas had sufficiently established statutory grounds to exercise jurisdiction over AJA and had established statutory grounds for termination of respondents' parental rights under MCL

---

[2] AJA was initially placed in a relative foster home, but she was moved to a nonrelative foster home later in the proceedings. AJA was not placed with a relative at the time of termination.

712A.19b(3)(b)(*i*), (b)(*ii*), (g), (j), (k)(*iii*), and (k)(*v*) by clear and convincing evidence. The court also scheduled a termination hearing to address whether termination was in AJA's best interests.

During the proceedings, respondent-father pleaded guilty to second-degree child abuse of AJA and was sentenced to one year in jail. At the time of the final termination hearing, respondent-father was on probation after serving that sentence and was also prohibited from having any contact with AJA due to a three-year no-contact order between him and AJA. Respondent-mother also faced criminal charges for the abuse of AJA, but she was released on bond shortly after her arrest; her criminal charges were still pending at the time of the termination hearing.

The termination hearing spanned two days. After considering all of the evidence and testimony provided by the parties, the trial court concluded that it was in AJA's best interests to terminate respondents' parental rights. Regarding respondent-father, the trial court reasoned that there was no bond between AJA and respondent-father, and he continued to demonstrate violent behavior and abuse substances after his release from incarceration. The trial court found that the fact that there was a three-year no-contact order between respondent-father and AJA made it impractical, if not impossible, for respondent-father to provide for AJA anytime soon, and the fact that respondent-father could not acknowledge the gravity of his actions or the severity of AJA's injuries only further demonstrated that AJA would not be safe in his care. Regarding respondent-mother, the trial court found that her substance abuse continued to affect her ability to properly care for AJA, she was unable to recognize AJA's emotional distress or adequately address AJA's needs during parenting times, and AJA was not significantly bonded to her. The trial court also found that respondent-mother created an unsafe living environment for AJA and presented an ongoing risk of harm to AJA's well-being by allowing respondent-father to live with her following his release from incarceration, despite his admitted physical abuse of AJA. The trial court found that AJA was bonded to her foster parents and thriving in a home that provided her the stability, permanence, and safety that she needed in her young life, and AJA's foster parents were interested in adopting AJA. The trial court entered an order terminating respondents' parental rights in October 2023. This appeal followed.

## II. NO-CONTEST PLEA

Respondent-mother challenges the validity of her no-contest plea, arguing that the plea was invalid because the trial court failed to adequately advise her of her rights under MCR 3.971(B). Respondent-mother also argues that the trial court, by accepting her invalid plea, did not properly assume jurisdiction over AJA and therefore violated her due-process rights. Relatedly, respondent-mother argues that the trial court, by accepting her plea for the purposes of establishing both jurisdiction and statutory grounds for termination, erroneously combined the adjudicative and dispositional phases of the proceedings in this case, thereby violating her due-process rights.

Because respondent-mother did not move to withdraw her no-contest plea or otherwise object to the advice of rights form provided in the lower court, we review the validity of respondent-mother's plea for plain error affecting substantial rights. See *In re Pederson*, 331 Mich App 445, 462-463; 951 NW2d 704 (2020). Respondent-mother also did not raise any of the other aforementioned issues in the trial court, so those issues are similarly unpreserved and reviewed for plain error affecting substantial rights. See *In re TK*, 306 Mich App 698, 703; 859 NW2d 208 (2014) (noting that issues not raised in the trial court, including issues related to constitutional due

process, are unpreserved and therefore reviewed for plain error affecting substantial rights). To obtain appellate relief under the plain-error standard of review, a respondent first must show: (1) an error occurred, (2) the error was clear or obvious, and (3) the error affected substantial rights. *In re MJC*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 365616); slip op at 2; *Pederson*, 331 Mich App at 463. "Generally, an error affects substantial rights if it caused prejudice, i.e., it affected the outcome of the proceedings." *MJC*, ___ Mich App at ___; slip op at 2 (quotation marks and citation omitted). After the respondent has satisfied these requirements, "an appellate court must exercise its discretion in deciding whether to reverse. Reversal is warranted when the plain, forfeited error seriously affected the fairness, integrity or public reputation of judicial proceedings." *Pederson*, 331 Mich App at 463 (quotation marks, citations, and ellipses omitted).

We see no merit in respondent-mother's challenges related to her no-contest plea. "In Michigan, child protective proceedings comprise two phases: the adjudicative phase and the dispositional phase." *In re Sanders*, 495 Mich 394, 404; 852 NW2d 524 (2014). "The question at adjudication is whether the trial court can exercise jurisdiction over the child (and the respondents-parents) under MCL 712A.2(b) so that it can enter dispositional orders, including an order terminating parental rights." *In re Ferranti*, 504 Mich 1, 15; 934 NW2d 610 (2019). The trial court may exercise jurisdiction if the petitioner proves the allegations in the petition at a trial by a preponderance of the evidence or if a respondent enters a plea of admission or no contest with respect to the allegations in the petition. *Id*. at 15. Although "the adjudicative phase is only the first step in child protective proceedings, it is of critical importance because the procedures used in adjudicative hearings protect the parents from the risk of erroneous deprivation of their parental rights." *Sanders*, 495 Mich at 405-406 (quotation marks, citation, and alterations omitted).

While a respondent may waive his or her right to an adjudication trial by admitting to the allegations in the petition or pleading no contest to them, the waiver must be done voluntarily, knowingly, and intelligently, and must reflect that the respondent is sufficiently aware of the relevant circumstances and likely direct consequences of the plea. *Ferranti*, 504 Mich at 30; *Pederson*, 331 Mich App at 464. "In the context of jurisdictional pleas in child-protective proceedings, 'our court rules reflect this due-process guarantee.' " *Pederson*, 331 Mich App at 465, quoting *Ferranti*, 504 Mich at 21 (alteration omitted). Before the trial court may accept a respondent's plea, it must advise a respondent of his or her rights on the record or in writing, as provided in MCR 3.971(B)(1) through (8).

It is apparent from the record in this case that, contrary to respondent-mother's claim, the trial court adequately advised respondent-mother of her rights prior to accepting her no-contest plea at the combined adjudication and initial dispositional hearing in accordance with MCR 3.971(B). The trial court first confirmed with respondent-mother and her counsel that respondent-mother waived a formal reading of the petition and that she wished to enter a no-contest plea with respect to the allegations in the petition. See MCR 3.977(B)(1)-(2). Following this, the trial court informed respondent-mother—and respondent-mother confirmed she understood—that if the court were to accept her no-contest plea, she would be waiving the right to have an adjudication trial in front of a judge or jury; to testify at trial; to present, call, or cross-examine witnesses at trial; and to have DHHS prove the allegations in the petition by a preponderance of the evidence for the purposes of adjudication. See MCR 3.977(B)(3). The trial court also explained to respondent-mother that her plea could be used against her as evidence in a subsequent termination hearing.

-4-

Although respondent-mother initially expressed some confusion as to that point, both respondent-mother's counsel and the trial court elaborated that the underlying facts of her plea could be used as evidence to prove statutory grounds for termination and that termination of her parental rights was in AJA's best interests, and respondent-mother affirmatively stated that she understood. See MCR 3.971(B)(4).

The trial court then confirmed with respondent-mother and her counsel that respondent-mother was satisfied with the advice of rights form that was provided, that a no-contest plea was appropriate due to the civil and criminal liability that respondent-mother faced as a result of allegations of physical abuse of AJA, and that the factual basis of the plea was the CPS Investigation Report. See MCR 3.971(B)(5)-(8) and (D)(2). Based on respondents' no-contest pleas, the trial court found that statutory grounds for jurisdiction under MCL 712A.2(b)(1) and (2) had been proven by a preponderance of the evidence, and it exercised jurisdiction over AJA. After announcing its findings on the record, the trial court informed respondent-mother that she could challenge its exercise of jurisdiction by filing an appeal. See MCR 3.971(B)(6). Both the advice of rights form and the trial court's order exercising jurisdiction over AJA reiterated all of the rights enumerated in MCR 3.971(B), the direct consequences of respondent-mother's no-contest plea, and the trial court's findings regarding jurisdiction.

Respondent-mother also argues that her plea was involuntary because the trial court wholly failed to inform her that, by pleading no contest, she was also waiving her right to have petitioner prove at least one of the statutory grounds for termination by clear and convincing evidence. This argument is also belied by the record. When the trial court informed respondent-mother of her rights pertaining to adjudication, it also explicitly stated that, by pleading no contest, she "waiv[ed] the right for the department to prove by clear and convincing evidence that there are statutory grounds to terminate [her] parental rights." The trial court also later clarified, "If I accept the no contest plea, the results will be that this matter will be put over and we will have trial as to best interest." In each instance, respondent-mother verbally confirmed that she understood. The trial court also stated in its written order exercising jurisdiction over AJA, which was provided to respondent-mother, that respondent-mother pleaded no-contest to *both* jurisdiction and statutory grounds for termination under MCL 712A.19b(3)(b)(*i*), (b)(*ii*), (g), (j), (k)(*iii*), and (k)(*v*), and the factual basis of the plea—the CPS Investigation Report—sufficiently proved statutory grounds for jurisdiction by a preponderance of the evidence and the cited statutory grounds for termination by clear and convincing evidence. The trial court also reiterated during its oral recitation of its factual findings regarding termination that, pursuant to respondent-mother's no-contest plea, the statutory grounds for termination had been proven by a clear and convincing evidence. As with her rights regarding adjudication, it is amply clear that the trial court advised respondent-mother of her rights relative to a termination hearing and the relevant burdens of proof.

On this record, we cannot conclude that the trial court erred in its handling of respondent-mother's no-contest plea or that respondent-mother's plea was anything but knowing, intelligent, and voluntary. See *Ferranti*, 504 Mich at 30; *Pederson*, 331 Mich App at 464. We therefore see no basis to conclude that respondent-mother was erroneously deprived of her due-process rights during the adjudicative phase of the proceedings when the trial court accepted her no-contest plea and exercised jurisdiction over AJA. See *Ferranti*, 504 Mich at 21; *Pederson*, 331 Mich App at 465-466.

We also cannot conclude that the trial court failed to adequately distinguish between the adjudicative and dispositional phases of the proceedings such that respondent-mother was denied due process. See *Sanders*, 495 Mich at 405-406; *In re Mota*, 334 Mich App 300, 315-316; 964 NW2d 881 (2020). "Once the trial court's jurisdiction is established, the case moves to the dispositional phase." *Ferranti*, 504 Mich at 16. "The dispositional phase involves a determination of what action, if any, will be taken on behalf of the child." *In re AMAC*, 269 Mich App 533, 537; 711 NW2d 426 (2006); see also MCR 3.973(A). During this phase, a trial court can order the termination of a respondent's parental rights at the initial dispositional hearing. *AMAC*, 269 Mich App at 537; see also MCL 712A.19b(4); MCR 3.977(E). A dispositional hearing may immediately follow an adjudication, but they may not be combined in such a way that leaves no distinction between the two phases. *AMAC*, 269 Mich App at 538; *Mota*, 334 Mich App at 315-316.

As previously discussed, the trial court in this case adhered to the requirements set forth in MCR 3.971 for a no-contest plea and, in doing so, it expressly informed respondent-mother of her rights relating to adjudication and termination as well as the burdens of proof for each. Respondent-mother acknowledged at the combined adjudication and initial dispositional hearing that she was entering a no-contest plea for both jurisdiction and statutory grounds for termination, and she affirmatively stated that she understood that the purpose of doing so was to establish facts supporting the trial court's exercise of jurisdiction for the purposes of adjudication and to establish facts supporting the cited statutory grounds for termination. Upon accepting respondent-mother's plea, the trial court first found that the CPS Investigation Report that provided the factual basis for the plea had established statutory grounds for jurisdiction by a preponderance of the evidence. The court then proceeded to the dispositional phase of the proceedings and found that the same facts from the report had established the cited statutory grounds for termination by clear and convincing evidence. See *Mota*, 334 Mich App at 315-316 (holding that, pursuant to MCR 3.977(E)(3), a trial court may consider any legally admissible evidence "properly introduced and admitted" during the adjudication phase of a combined adjudication and initial dispositional hearing when determining whether the statutory grounds for termination have been proven by clear and convincing evidence during the dispositional phase immediately thereafter). After doing so, the trial court then adjourned the hearing and scheduled a termination hearing on a later date so that the parties could present their proofs regarding the best-interests portion of the termination determination. Only after receiving two additional days' worth of testimonial and documentary evidence did the trial court orally announce its findings related to termination or make a final decision terminating respondent-mother's parental rights. Unlike in *Mota*, we are not presented with a situation in which adjudication and disposition were erroneously indistinguishable; rather, the trial court in this case adhered to the procedural safeguards set forth in our court rules such that there was a clear bifurcation between the adjudicative phase and the dispositional phase of the proceedings. We see no error warranting reversal. See *id.*; *MJC*, ___ Mich App at ___; slip op at 2, 7-8.

## III. REASONABLE EFFORTS

Respondent-mother also argues that the trial court clearly erred by finding that DHHS was not required to make reasonable efforts toward reunification. We ordinarily "review for clear error a trial court's decision regarding reasonable efforts," but because respondent-mother failed to preserve this issue by raising it in the trial court, our review is for plain error affecting substantial rights. *In re Sanborn*, 337 Mich App 252, 258; 976 NW2d 44 (2021).

DHHS is obligated to make reasonable efforts to reunify the family in all cases except those involving an aggravated circumstance listed in MCL 712A.19a(2). *Id.* at 259. One such aggravated circumstance exists when DHHS "determines that a parent . . . has abused the child or a sibling of the child" and the abuse includes "[b]attering, torture, or other serious physical harm." MCL 722.638(1)(a)(*iii*). "Under MCL 712A.19a(2)(a), there must be a judicial determination that the parent has subjected the child to aggravated circumstances before [DHHS] is excused from making reasonable efforts." *In re Smith-Taylor*, 509 Mich 935, 935; 971 NW2d 657 (2022) (quotation marks omitted). The trial court must articulate its "factual finding based on clear and convincing evidence that aggravated circumstances exist such that services are not required." *In re Simonetta*, 507 Mich 943, 943; 959 NW2d 170 (2021). See also MCL 712A.19a(2)(a); MCR 3.977(E), (I).[3]

Although the trial court did not explicitly use the term "aggravated circumstances" in its oral recitation of its findings, it is undoubtedly clear from the record that the court made the judicial determination that reasonable efforts were not required due to the abuse of AJA by respondents that was clearly reflected in the allegations of the petition and the CPS Investigation Report. See *Simonetta*, 507 Mich at 943; *Smith-Taylor*, 509 Mich at 935. Indeed, the CPS Investigation Report indicated that AJA's significant injuries were the result of nonaccidental trauma that occurred while in respondents' care, and both respondents admitted to physically harming AJA, either directly or by failing to protect AJA from the harm inflicted by the other parent. Such allegations plainly constitute an aggravated circumstance. See MCL 712A.19a(2); MCL 722.638(1)(a)(*iii*). The trial court further found that, in light of the allegations in the petition and the facts contained in the report, "reasonable efforts are not to be offered to reunite" the family because AJA was "at a significant risk of harm in either parents' care." On the same basis, the trial court suspended respondents' parenting time entirely because "even supervised visits would present an ongoing, continuous risk of harm to this child's safety." The trial court also reiterated these findings in the order following the preliminary hearing, in which it stated that reasonable efforts toward reunification were not required due to respondents subjecting AJA "to the aggravated circumstance(s) of [s]evere physical abuse/torture . . . as provided in section MCL 722.638(1) and (2)." Given the severity of the allegations, we see no error in the trial court's finding that DHHS was not obligated to make reasonable efforts to preserve or reunify the family. See *Sanborn*, 337 Mich App at 258-259, 262. Because the trial court appropriately found that reasonable efforts were not required pursuant to MCL 712A.19a(2)(a), respondent's argument that DHHS failed to make reasonable efforts is meritless. See *In re Rippy*, 330 Mich App 350, 358-359; 948 NW2d 131 (2019).

## IV. STATUTORY GROUNDS FOR TERMINATION

Respondent-mother argues that the trial court clearly erred by finding clear and convincing evidence supporting termination of her parental rights under MCL 712A.19b(3)(b)(*i*), (b)(*ii*), (g),

---

[3] "MCR 3.977(E) provides the procedural requirements for terminating parental rights at an initial dispositional hearing." *In re Utrera*, 281 Mich App 1, 16; 761 NW2d 253 (2008). Respondent-mother makes no argument on appeal that the trial court failed to comply with the procedural requirements set forth in MCR 3.977(E).

(j), (k)(*iii*), and (k)(*v*). As a preliminary matter, because respondent-mother entered a no-contest plea concerning statutory grounds for termination, she may not now challenge that finding on appeal. See *In re Hudson*, 294 Mich App 261, 264; 817 NW2d 115 (2011) ("[A] [r]espondent may not assign as error on appeal something that [he or] she deemed proper in the lower court because allowing [him or] her to do so would permit [the] respondent to harbor error as an appellate parachute."). We nevertheless conclude that the trial court did not clearly err by finding that at least one statutory ground for termination had been proven by clear and convincing legally admissible evidence. See MCR 3.977(E)(3); *Hudson*, 294 Mich App at 264 (explaining that, when the challenge has been preserved, this Court reviews for clear error a trial court's finding that a statutory ground for termination of parental rights has been proven by clear and convincing evidence).

Grounds for termination under MCL 712A.19b(3)(b)(*ii*) exist if "[t]he parent who had the opportunity to prevent the physical injury or physical or sexual abuse failed to do so and the court finds that there is a reasonable likelihood that the child will suffer injury or abuse in the foreseeable future if placed in the parent's home." As previously discussed, the trial court relied on the CPS Investigation Report as the factual basis for respondent-mother's no-contest plea regarding the statutory grounds for termination. See MCR 3.971(D)(2). The report described the investigation into the injuries suffered by AJA, including interviews with medical, emergency, and hospital personnel, as well as with respondents and the police officers who interviewed respondents. As detailed in the report, AJA had sustained a multitude of severe injuries inconsistent with any accident or actions in the normal day-to-day care of an infant while she lived exclusively with respondents. Respondent-mother informed medical staff, police officers, and the CPS investigators that she knew that respondent-father and was often "too rough" with AJA and had squeezed AJA too hard when attempting to swaddle her tightly, which respondent-father admitted had caused AJA's rib fractures. Respondent-mother also later admitted that she had watched as respondent-father picked AJA up "with one arm and raised her in the air by her neck," which respondent-father admitted had choked AJA and ultimately caused the bruising on her neck and hemorrhaging in her eyes. Respondent-father also admitted that he had repeatedly slapped AJA in the face several times over a period of two weeks, and respondent-mother provided photographs to medical staff and investigators of many of AJA's injuries, all of which had been taken several days prior to when she took AJA to the pediatrician to examine the injuries.

While the content of the report was sufficient in itself to find that termination was proper under MCL 712A.19b(3)(b)(*ii*), the additional testimonial and documentary evidence presented at the termination hearing only further confirmed that finding. Respondents' caseworker testified that respondent-mother violated respondent-father's three-year no-contact order with AJA shortly before the termination hearing by allowing respondent-father to speak to AJA on the phone. Respondent-mother allowed respondent-father to move back into her home after his release from incarceration and planned to raise AJA with him in her home, despite knowing that this would violate his no-contact order and the terms of his probation. During her testimony, respondent-mother recognized that respondent-father admitted to severely injuring AJA, but she did not believe that respondent-father intended the injuries. The caseworker testified that respondent-mother completed a psychological evaluation in April 2023, and the psychologist reported that respondent-mother "did not recognize the seriousness" of respondent-father's abuse of AJA or the extent of AJA's injuries, "minimize[d] and dismiss[ed] accountability" regarding her involvement

in the situation, and "was unable to formulate a plan to prevent any similar occurrences in the future, which seem[ed] to suggest[] little if any thought ha[d] went into what c[ould] be done to change."

Accordingly, the trial court did not clearly err by finding that there was clear and convincing legally admissible evidence that respondent-mother will not prioritize AJA's safety or defend AJA against abuse in the future. Termination of respondent-mother's parental rights to AJA was therefore proper under MCL 712A.19b(3)(b)(*ii*). Because only one statutory ground need be established by clear and convincing legally admissible evidence to terminate a respondent's parental rights, we need not address respondent-mother's arguments regarding MCL 712A.19b(3)(b)(*i*), (g), (j), (k)(*iii*), and (k)(*v*). See MCR 3.977(E)(3); *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011).

## V.  BEST INTERESTS

Respondent-mother and respondent-father both argue that the trial court clearly erred by finding that termination of their parental rights was in AJA's best interests. We disagree.

We review for clear error a trial court's finding that termination is in a child's best interests. *In re Olive/Metts Minors*, 297 Mich App 35, 40; 823 NW2d 144 (2012). "[W]hether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence." *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). This Court gives deference to "the special ability of the trial court to judge the credibility of witnesses." *In re Medina*, 317 Mich App 219, 227; 894 NW2d 653 (2016) (quotation marks and citation omitted).

When determining whether termination is in the best interests of the child, the court should place its "focus on the child rather than the parent." *In re Schadler*, 315 Mich App 406, 411; 890 NW2d 676 (2016). "The trial court should weigh all the evidence available to determine the child[]'s best interests," and it should consider a variety of factors, including "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014) (quotation marks and citation omitted). "The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the child[]'s well-being while in care, and the possibility of adoption." *Id*. at 714.

The trial court did not clearly err by finding that termination of respondents' parental rights was in AJA's best interests. Respondents' caseworker testified that DHHS initially filed for termination at initial disposition due to the extensive physical injuries AJA sustained while in the exclusive care of respondents, which included "ten posterior rib fractures"; bruises at various stages of healing on AJA's head, neck, ears, arms, lungs, and chest; and "hemorrhaging in her eyes." The extent of AJA's injuries, respondents' admissions regarding the abuse, and DHHS's investigation into the allegations were also thoroughly detailed in the CPS Investigation Report admitted as evidence to serve as the factual basis for respondents' no-contest pleas. At the time of the termination hearing, respondent-father had pleaded guilty to second-degree child abuse and was incarcerated for a year, and respondent-mother's criminal charges related to the abuse remained pending. Respondents' caseworker testified that while AJA's development was not

severely delayed, there were concerns that there may be long-term effects on AJA's physical, emotional, and mental well-being due to the physical abuse that she had endured.

There was also significant evidence presented indicating that respondents' substance abuse persisted and affected their parenting abilities. The caseworker testified that respondent-mother did not believe that she had a substance abuse problem and continued to use her prescribed medication at much higher levels than prescribed, and the record also contained multiple recorded phone calls featuring respondent-mother discussing her abuse of amphetamines and Xanax as recently as June 2023. Respondent-mother additionally attended a supervised visitation with AJA while under the influence of tetrahydrocannabinol (THC), and she refused to participate in a drug screening. When the caseworker discussed substance abuse as a barrier to reunification with respondent-mother, she was unwilling to engage in substance-abuse services. Respondent-father admitted to consuming Xanax and THC with respondent-mother while AJA was in their care and, during a recorded jail phone call, he shared his intent to continue abusing substances upon his release from incarceration. Following both respondents' participation in a psychological evaluation, the psychologist reported that neither respondent was forthcoming about their substance abuse or acknowledged that they had a substance-abuse issue. The psychologist further reported that respondents' substance abuse "contributed to an un[stable] mental state and environment for a child" and that neither respondent demonstrated a "sincerity and willingness" to address their substance abuse.

DHHS also presented evidence that there was minimal or no bond between AJA and respondents and that respondents still lacked the parenting skills necessary to adequately care for AJA. The caseworker testified that respondent-father never inquired about AJA while incarcerated and could not even participate in parenting time following his release due to a three-year no-contact order with AJA. Respondent-mother engaged in the majority of her supervised parenting times, but she was unable to recognize or address AJA's emotional needs during several of the visitations, AJA cried throughout the entirety of those visitations and did not wish to be held by her, and AJA did not demonstrate a strong bond to her. The caseworker referred AJA for infant mental health services because AJA demonstrated "trauma responses" to being held by respondent-mother— responses that she did not exhibit when held by others. The therapist reported that AJA had a "muted personality" during the majority of supervised visitations with respondent-mother and became inconsolable after returning to her foster home. AJA's foster parents reported that "she had the worst responses that she ever had" after respondent-mother permitted respondent-father to speak to her on the phone in violation of the no-contact order, noting that she was "inconsolable all night and woke up many times in the night crying." Conversely, AJA was safe and thriving in her foster placement, and AJA's foster home was meeting all of her needs and expressed interest in adoption.

There was also evidence that respondents still presented a significant risk of harm to AJA's safety and well-being. Respondent-father testified that he accepted responsibility for AJA's injuries and was focused on her safety and well-being going forward, but he also continued to claim that respondent-mother was responsible for AJA's injuries. The caseworker testified that respondent-father completed parenting education packets and some mental health services while incarcerated, but his subsequent psychological evaluation revealed that his dangerous, violent, and impulsive behavior continued to pose a significant safety risk to AJA, and transcripts of his jail phone calls demonstrated his verbal abuse of respondent-mother. Testimony from respondent-

mother and the caseworker made clear that respondent-mother had no intention of raising AJA without respondent-father's assistance, despite his past abuse of AJA and despite knowing that he remained barred from all contact with AJA by his no-contact order and the terms of his probation. Respondent-mother's inability to grasp the seriousness of respondent-father's abuse of AJA or describe any actionable steps to prevent the abuse from occurring in the future, particularly when viewed in light of respondent-father's behavior, only amplified the ongoing risk of harm to AJA.

There was also evidence that respondents could not provide AJA with safe or adequate housing. In addition to the ongoing concerns discussed above regarding abuse and substance use in the home environment that respondents would provide, the caseworker testified that, while respondent-mother maintained suitable housing, she was at risk of losing the home due to a large debt attached to it, and neither she nor respondent-father expressed concern or had any plan to address the issue in the future. Respondent-mother did not provide any documentation to verify that she had a legal source of income, and respondent-father indicated that he did not plan on contributing financially to the home because he was unemployed following his release from jail, despite the fact that he received public assistance. Additionally, the caseworker testified that respondents' expectation that AJA would live with both of them upon her return, despite knowing that respondent-father's no-contact order with AJA prohibited it, demonstrated that neither contemplated feasible living arrangements or care for AJA.

Given the substantial risk of harm to AJA's safety and well-being posed by respondents' substance abuse, parenting skills, domestic abuse, mental health, and living arrangements; AJA's trauma responses to interactions with respondents; AJA's young age and need for permanency, safety, and stability; the fact that AJA's foster placement was meeting her needs; and the preference for adoption expressed by AJA's foster parents, the trial court did not clearly err by finding that it was in AJA's best interests to terminate respondents' parental rights.

Affirmed.

/s/ Anica Letica
/s/ Mark T. Boonstra
/s/ Philip P. Mariani